# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DONALD L. BLANKENSHIP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10610-CB |
| | ) | |
| ALPHA APPALACHIA HOLDINGS, INC., f/k/a | ) | |
| MASSEY ENERGY COMPANY, a Delaware | ) | |
| corporation, and ALPHA NATURAL | ) | |
| RESOURCES, INC., a Delaware corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  May 14, 2015
Date Decided:  May 28, 2015

Daniel B. Rath, K. Tyler O'Connell and Travis J. Ferguson of LANDIS RATH & COBB LLP, Wilmington, Delaware; Graeme W. Bush and Andrew N. Goldfarb of ZUCKERMAN SPAEDER LLP, Washington, D.C.; *Attorneys for Plaintiff*.

Donald J. Wolfe, Jr., Matthew E. Fischer and Jacqueline A. Rogers of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Mitchell A. Lowenthal, Lev L. Dassin, Victor L. Hou and Marla A. Decker of CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York; William S. Ohlemeyer of BOIES, SCHILLER & FLEXNER LLP, Armonk, New York; *Attorneys for Defendants*.

**BOUCHARD, C.**

## I. INTRODUCTION

This advancement action involves some unusual facts but an all too common scenario: the termination of mandatory advancement to a former director and officer when trial is approaching and it is needed most.

Plaintiff Donald L. Blankenship is the former Chief Executive Officer and Chairman of Massey Energy Company, which is now known as Alpha Appalachia Holdings, Inc. ("Massey"). Blankenship held those positions when there was a tragic explosion at a Massey subsidiary's coal mine in West Virginia in April 2010, killing 29 miners. In June 2011, after Blankenship had retired from Massey, Alpha Natural Resources, Inc. ("Alpha") acquired Massey. For several years after the explosion, Massey and Alpha (together, the "Defendants") honored Blankenship's rights to advancement and paid his legal expenses relating to various civil proceedings and a federal criminal investigation that had been launched as a result of the explosion.

On November 13, 2014, the United States Attorney for the Southern District of West Virginia obtained a four-count criminal indictment against Blankenship. Blankenship is presently scheduled to go to trial on July 13, 2015.

In the wake of the indictment, Alpha stopped paying Blankenship's legal fees. Alpha management, with approval from Alpha's board of directors, then initiated a process to review the company's indemnification and advancement obligations to Blankenship. Alpha focused on an unusual undertaking Blankenship had signed in April 2011 (the "Undertaking"), which states, in relevant part, that Massey's indemnification and advancement obligations to Blankenship are "contingent upon [certain] factual

1

representations and undertakings," including a representation that, in performing his duties as a director and officer of Massey, Blankenship "had no reasonable cause to believe that [his] conduct was ever unlawful." In late January 2015, after a process described below, Philip Cavatoni, an Alpha officer and Massey director, determined that Blankenship had breached that representation (the "Determination"). Based on the Determination, Alpha asserts that Blankenship is no longer entitled to advancement of any of his legal expenses from Massey.

On February 5, 2015, Blankenship filed this action seeking advancement of his unpaid legal expenses under, among other sources, the terms of Massey's October 2010 Amended and Restated Certificate of Incorporation (the "Charter") and an Agreement and Plan of Merger between Massey and Alpha (the "Merger Agreement"). Most of these unpaid legal expenses were incurred in connection with the criminal proceeding to which Blankenship was made a party in November 2014 as a result of the indictment.

In this post-trial opinion, I conclude that the Undertaking cannot reasonably be interpreted in the manner advocated by Defendants and that the Determination thus did not provide a valid basis for Defendants to terminate Blankenship's advancement rights under Massey's Charter. I also conclude that Blankenship is entitled to advancement from Alpha as well as Massey for the legal expenses he has incurred in connection with the criminal proceeding under the unambiguous terms of the Merger Agreement.

2

## II.     BACKGROUND

These are the facts as I find them based on the documentary evidence and testimony of record.[1]

### A.     The Parties

Plaintiff Donald L. Blankenship is the former Chief Executive Officer and Chairman of the board of directors of Massey Energy Company.

Defendant Alpha Appalachia Holdings, Inc., formerly known as Massey Energy Company, is a Delaware corporation engaged in the coal mining business. Massey is currently a wholly owned subsidiary of Alpha Natural Resources, Inc.

Defendant Alpha Natural Resources, Inc., a Delaware corporation based in Linthicum Heights, Maryland, also is in the coal mining business.

### B.     The Explosion at Massey's Upper Big Branch Mine

In April 2010, an explosion occurred at the Upper Big Branch ("UBB") mine operated by Performance Coal Company ("Performance"), a Massey subsidiary, killing 29 miners. Shortly after the UBB explosion, the United States Attorney's Office for the Southern District of West Virginia (the "U.S. Attorney") commenced an investigation into the underlying facts and circumstances of the explosion.[2]

---

[1] By stipulation, deposition testimony is part of the trial record. Pre-Trial Stip. and Order ("Pre-Trial Stip.") ¶ 6(4).

[2] *Id.* ¶ 2(19).

## C. Blankenship Engages Zuckerman Spaeder LLP

In June 2010, William W. Taylor, III, a partner at the law firm of Zuckerman Spaeder LLP ("Zuckerman Spaeder"), sent a letter to Blankenship (the "Engagement Letter") to confirm the terms and conditions under which Zuckerman Spaeder would "represent [him] in connection with investigations resulting from the Upper Big Branch mine explosion, and related matters if requested to undertake them."[3]  According to Taylor, the Engagement Letter is part of Zuckerman Spaeder's standard practice with clients, "particularly when there will be third-party defendant payment by a company or some other third-party defendant for an individual client."[4]

The Engagement Letter sets forth Massey's commitment to pay Blankenship's legal fees on a timely basis, as follows:

> Massey Energy Company agrees to pay all fees and expenses incurred within thirty days of the date of any invoice.  Any outstanding balances that are not paid when due will accrue a service charge at the rate of twelve (12) percent per annum (one percent (1%) per month) from the due date until paid, in order to offset the costs of carrying any overdue amount.[5]

The Engagement Letter does not refer to Blankenship's indemnification rights under Massey's Charter or to the need for an undertaking to obtain advancement of his legal fees.

---

[3] JX 21 (Engagement Letter) at DBDEL0009.

[4] Trial Tr. ("Tr.") 12 (Taylor).

[5] JX 21 (Engagement Letter) at DBDEL0010.

4

Blankenship and Shane Harvey, then-General Counsel of Massey, both signed the Engagement Letter as "SEEN and AGREED."[6] Before executing the document, Blankenship asked Harvey if it was "OK" to sign it.[7] Blankenship put no pressure on Harvey to decide whether the Engagement Letter was acceptable.[8]

Taylor testified that the Engagement Letter reflects Massey's unconditional promise to pay Blankenship's legal fees.[9] Blankenship, by contrast, acknowledged that he did not think that the Engagement Letter "enhanced" his advancement rights.[10]

### D.    Blankenship Retires from Massey

On December 3, 2010, Blankenship entered into a Retirement Agreement with Massey by which he would retire as CEO and Chairman effective December 31, 2010.[11] The retirement was "not entirely voluntary."[12] Paragraph 12 of the Retirement Agreement, entitled "Indemnity Obligations," sets forth Massey's agreement to maintain its then-existing indemnification and advancement obligations to Blankenship:

> The Company [*i.e.*, Massey] agrees to maintain and adhere to all its obligations to indemnify you and advance your legal fees in accordance with the terms and conditions set forth in the Company's Certificate of

---

[6] *Id.* at DBDEL0011.

[7] JX 20B (Email from Don L. Blankenship to Shane Harvey (June 3, 2010)).

[8] Tr. 67 (Blankenship).

[9] *Id.* 28, 59 (Taylor).

[10] *Id.* 77-78 (Blankenship); Blankenship Dep. 48-49.

[11] JX 25 (Retirement Agreement).

[12] Tr. 23 (Taylor).

Incorporation and any written indemnity agreements existing and in force as of your Retirement Date, or as otherwise imposed by law, for so long as those agreements or legal obligations require.[13]

Taylor, who represented Blankenship in connection with his retirement from Massey and negotiated the Retirement Agreement, testified that the language in Paragraph 12 likely was in the draft when he received it and was not controversial. He also believed the phrase "written indemnity agreements" referred to the Engagement Letter.[14] Admiral Bobby R. Inman, Massey's lead independent director at the time, executed the Retirement Agreement on behalf of Massey.[15]

### E. Massey Enters Into a Merger Agreement with Alpha

In approximately May 2010, after the UBB explosion, Alpha began to explore a potential acquisition of Massey. Alpha retained Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") as its legal advisor in connection with that transaction. Cleary Gottlieb remained Alpha's outside counsel throughout that process and in connection with the events that gave rise to this action.

On January 28, 2011, Massey and Alpha entered into the Merger Agreement,[16] under which Alpha would acquire Massey in a cash-and-stock transaction. Section 5.05 of the Merger Agreement sets forth the respective obligations of Massey and Alpha to the

---

[13] JX 25 (Retirement Agreement) at ¶ 12.

[14] Tr. 22-23 (Taylor).

[15] JX 25 (Retirement Agreement) at DBDEL0035.

[16] JX 26 (Merger Agreement).

defined "Indemnified Parties," which include Blankenship as a former director and officer of Massey.

The merger was the subject of a preliminary injunction application in *In re Massey Energy Co. Derivative and Class Action Litigation*.[17] In brief, Massey stockholders argued that the board did not obtain adequate value from Alpha for certain derivative claims relating to the company's mine safety policies and procedures.[18] As discussed below, the Court considered Alpha's indemnification obligations to Blankenship under the Merger Agreement as part of its analysis. Ultimately, for reasons not relevant to this action, then-Vice Chancellor Strine denied the preliminary injunction motion, and the case remains pending before the Court.

On June 1, 2011, Alpha completed its acquisition of Massey, which is now a wholly owned subsidiary of Alpha.

## F.     The Undertaking

On June 14, 2010, about six months before his retirement, Blankenship executed an undertaking to obtain advancement from Massey of his legal expenses incurred in

---

[17] 2011 WL 2176479 (Del. Ch. May 31, 2011).

[18] *See id.* at *9 ("In broad strokes, the Derivative Claims rest on allegations that certain current and former directors and officers of Massey breached their fiduciary duties during the period from May 21, 2008 to the present by (i) 'chronically disregarding mining safety regulations and incurring nearly $27 million in assessed violations by the [MSHA], comprising a material portion of its net income in any given year; and (ii) consistently failing to adequately address poor safety conditions of its mines[.]' ").

7

connection with legal proceedings relating to Massey's compliance with environmental and safety regulations.[19] The June 2010 undertaking is not at issue in this action.

On March 29, 2011, after the Merger Agreement was signed but before the transaction closed, Stephanie Ojeda, Senior Corporate Counsel of Massey, sent a new proposed undertaking (as defined above, the "Undertaking") to Taylor at Zuckerman Spaeder.[20] In a cover letter, Ojeda explained that Massey remained committed to its indemnification obligations to Blankenship (and other employees of Massey) and that the enclosed Undertaking "clarifies" the relationship between Massey and Blankenship:

> In light of the impending merger, I write to address the legal representation you are providing to employees of Massey and its affiliated entities in relation to ongoing government investigations of the April 5,

---

[19] The June 2010 undertaking states, in relevant part:

> By signing this letter, I agree to the following terms:
>
> 1.    The advancement of legal expenses will be made under Article NINETEENTH of the Company's [*i.e.*, Massey's] Certificate of Incorporation, which provides indemnification to its directors and officers to the fullest extent authorized by the Delaware General Corporation Law, and the Company may cease advancing legal expenses on my behalf at any time if the Company determines that I am not otherwise entitled to the advancement of legal expenses under such Article[.]
>
> 2.    I will repay to the Company all legal expenses paid on my behalf if it is ultimately determined that I am not entitled to be indemnified by the Company for such expenses under the Certificate of Incorporation of the Company, the Delaware General Corporation Law, or any other law regulation.

JX 22 (Undertaking from Donald Blankenship to Massey Energy Company (June 14, 2010)).

[20] JX 27 (Letter from Stephanie Ojeda to Bill Taylor (Mar. 29, 2011)). Ojeda testified she thought someone else drafted the cover letter, but she was not sure. Ojeda Dep. 39.

8

2010 accident at Upper Big Branch. The Company remains committed to providing appropriate assistance with the legal defense of its individual employees in connection with those investigations and, accordingly, will continue to do so after the merger with Alpha is finalized.

In the meantime, I ask that each represented individual sign the attached undertaking, which *clarifies* the relationship between Massey and your client(s) with respect to their legal representation in this matter and payment therefor. Please review the attached undertaking with your client(s) and return the signed form(s) to my attention.

I appreciate your service on behalf of Massey's valued members. Please contact me at [redacted] if you have any questions regarding this letter or the attached undertaking.[21]

Other than this cover letter, there are no written communications in the record concerning the meaning of the Undertaking.

The provision at the end of the first paragraph of the Undertaking states that Massey's indemnification and advancement obligations are "contingent upon" three enumerated "factual representations and undertakings." I refer to that provision as the "Contingency Provision." The legal effect of the factual representation in the second enumerated paragraph is a critical issue in this case. I refer to that representation as the "Reasonable Cause Representation." The last paragraph of the Undertaking states explicitly that Massey shall not be obligated to advance further expenses to Blankenship in two specified circumstances. I refer to that provision as the "Termination Provision." The entire text of the Undertaking is quoted below:

I, Donald L. Blankenship, have retained counsel to represent me in connection with a federal criminal grand jury investigation conducted by the Office of the United States Attorney for the Southern District of West

---

[21] JX 27 at 1 (emphasis added).

Virginia and agents of the Federal Bureau of Investigation and Federal Mine Safety and Health Administration, as well as in connection with any concurrent or other proceedings relating to Performance Coal Company ("Performance"), Massey Energy Company ("Massey"), Massey Coal Services, Inc. ("MCS"), and any affiliates or certain officers, employees or other persons associated with these entities. *It is my understanding that Massey will indemnify me and/or advance on my behalf the fees and costs associated with this representation, contingent upon the following factual representations and undertakings, which I hereby make and declare to be true* [as defined above, the "Contingency Provision"]:

1.     In the performance of my actions as an officer, director, employee, or consultant of Massey and/or any of its affiliates and subsidiaries, including but not limited to MCS, I acted in good faith and in a manner that I reasonably believed to be consistent with the best interests of Massey and its affiliates and subsidiaries;

2.     In the performance of my actions as an officer, director, employee, and consultant of Massey and/or any of its affiliates and subsidiaries, including but not limited to MCS, *I had no reasonable cause to believe that my conduct was ever unlawful* [as defined above, the "Reasonable Cause Representation"]; and

3.     If it shall ultimately be determined that I am not entitled to the indemnification described above and in any applicable Agreement for Indemnification, consistent with governing laws, I hereby agree to repay Massey any sums that Massey has expended on my behalf for indemnification or advancement.

I further understand that, in any event, Massey, Performance, and/or MCS shall not be obligated to indemnify me or advance further fees and costs on my behalf if: (i) I should enter a plea of guilty, or be found guilty by a court or jury, on any criminal charge related to my actions as an officer, director, employee, and consultant of Massey and/or any of its affiliates and subsidiaries, including but not limited to MCS, or otherwise relating to the subject matter of the above-described criminal investigation; or (ii) Massey, Performance, and/or MCS otherwise determines that I am not entitled to indemnification under governing laws [as defined above, the "Termination Provision"].[22]

---

[22] JX 28 (Undertaking) at ANR_AAR-00000442-43 (emphasis added).

The Undertaking refers to two entities (Performance and MCS) in addition to Massey that were not mentioned in the June 2010 undertaking. Before his retirement, Blankenship held various positions at Performance and MCS, both of which are West Virginia corporations.[23]

Massey drafted the Undertaking.[24] Taylor, on behalf of Blankenship, did not have any discussions with Ojeda or anyone else at Massey about the Undertaking, nor did he suggest any changes to the document.[25] Ojeda, who did not appear at trial, testified in deposition that she understood the Undertaking to be "just confirmation of a duty or obligation with respect to indemnifying and advancing fees. The obligation had already been established[.]"[26] When asked what she meant by "the obligation had already been established," Ojeda explained, "That the company [*i.e.*, Massey] had already agreed to indemnify and advance fees, and it [*i.e.*, the Undertaking] was just a restatement of that, after the announcement of the merger agreement."[27]

---

[23] *See, e.g.*, Defs.' Ans. Br. Ex. B (Articles of Incorporation of Massey Coal Services, Inc.); Defs.' Ans. Br. Ex. D (Articles of Incorporation of Performance Coal Company). Because Blankenship is not seeking relief from those entities, which are not parties to this litigation, I do not address their advancement obligations to him under West Virginia law.

[24] Taylor Dep. 39-40.

[25] Tr. 45, 49-50 (Taylor).

[26] Ojeda Dep. 32.

[27] *Id.* 33.

11

Taylor likely discussed the Undertaking with another partner at his firm, but he did not "conduct an elaborate legal analysis"[28] even though he acknowledged at trial that the Undertaking was unlike any he has seen in his four decades of practice.[29] Zuckerman Spaeder's billing records reflect that about one hour of attorney time in total was devoted to reviewing the Undertaking.[30] Afterwards, Taylor offered advice to Blankenship about it, most likely via a letter dated April 11, 2011.[31] Taylor testified that, although he could not recall specifically what he thought at the time, he was "confident that [he] did not believe that [the Undertaking] modified or changed Mr. Blankenship's rights to advancement in any respect" and that he "would not have acquiesced in [Blankenship's] signing it had [he] believed that."[32]

Blankenship was sure that he and Taylor would have communicated about the Undertaking before he signed it, but he could not recall any specific conversations they may have had.[33] Blankenship further testified that, when he received the Undertaking, no one at Massey had ever informed him that he was in breach of the Retirement Agreement

---

[28] Tr. 25, 61 (Taylor).

[29] *Id.* 46 (Taylor).

[30] *Id.* 62 (Taylor).

[31] *Id.* 49-50 (Taylor); *id.* 89-90 (Blankenship); JX 52 (Pl.'s Privilege Log). Privilege was asserted with respect to any advice Taylor or Zuckerman Spaeder gave Blankenship concerning the Undertaking. Tr. 60-61; JX 52 (Pl.'s Privilege Log).

[32] Tr. 25-26 (Taylor).

[33] *Id.* 89-90 (Blankenship).

or that Massey wanted to modify any provision of the Retirement Agreement,[34] Section 12 of which (quoted above) required Massey to maintain its then-existing indemnification and advancement obligations to Blankenship.

On April 12, 2011, Blankenship executed the Undertaking. By letter dated April 21, 2011, the executed Undertaking was sent to Massey.[35]

### G.     Massey and Alpha Advance Blankenship's Legal Fees

As it had before the merger, Zuckerman Spaeder continued to submit invoices for its representation of Blankenship to Massey after the merger. In 2012, likely at the request of someone at Massey, Zuckerman Spaeder began submitting invoices to Alpha.[36] When this change happened is not clear. Taylor did not pay attention to who paid the invoices. As long as they were paid, it "didn't matter" to him who paid them.[37]

In its invoices, Zuckerman Spaeder listed the total expenses incurred as well as a summary of the legal fees incurred by attorney, number of hours, and hourly rate without any details as to the specific services rendered during the billing period.[38] This arrangement was consistent with the Engagement Letter, which provides that invoices

---

[34] *Id.* 72-73 (Blankenship).

[35] JX 28 (Letter from William W. Taylor, III to Shane Harvey (Apr. 21, 2011)) at ANR_AAR-00000441.

[36] JX 23 (Letter from William W. Taylor, III to Stephanie Ojeda of Massey (Aug. 31, 2010)); JX 34 (Letter from William W. Taylor, III to Vaughn Groves of Alpha (Mar. 1, 2012)).

[37] Tr. 17, 20 (Taylor).

[38] JX 57 at 2-15.

submitted to Massey would "not contain an itemization of . . . time and expenses but will show a summary of hours and fees" to "avoid disclosure of privileged information and possible waiver of the attorney client privilege."[39]

At times, upon a request by Alpha, Zuckerman Spaeder sent copies of invoices containing time detail that were heavily redacted to "obliterate[] anything that was substantive about the nature of our work."[40]  According to Taylor, the substantial redactions complied with the Engagement Letter and were necessary because Alpha had entered into a cooperation agreement with the United States Department of Justice.[41] Massey and/or Alpha paid Zuckerman Spaeder's invoices until November 2014.[42]

## H.    The Indictment and Criminal Proceeding

On November 13, 2014, a federal grand jury handed down the Indictment in the United States District Court for the Southern District of West Virginia in a proceeding captioned *United States v. Blankenship*, No. 5:14-cr-00244 (the "Criminal Proceeding").[43]  The Indictment charged Blankenship with (i) conspiracy to willfully violate mandatory mine safety and health standards; (ii) conspiracy to defraud the United States by concealing mine safety violations; (iii) making false statements to the U.S.

---

[39] JX 21 (Engagement Letter) at DBDEL0010.

[40] Tr. 20 (Taylor).

[41] *Id.* 19-20 (Taylor).

[42] Pre-Trial Stip. ¶ (2)28.

[43] JX 39 (Indictment).

14

Securities and Exchange Commission; and (iv) securities fraud by making false public statements.[44] Defendants have stipulated that the Indictment charges Blankenship with crimes by reason of the fact that he was an officer and director of Massey.[45]

Blankenship retained Zuckerman Spaeder, his counsel during the U.S. Attorney's investigation, to conduct his defense in the Criminal Proceeding. Zuckerman Spaeder retained counsel in West Virginia to assist in the representation.[46]

## I.     Alpha Management Reviews Blankenship's Advancement Rights

On November 19, 2014, on the second day of a two-day Alpha board meeting, Clearly Gottlieb "apprised the Board of recent events pertaining to the pending criminal investigation [of Blankenship] related to the Upper Big Branch explosion,"[47] which included summarizing the Indictment and broadly discussing Blankenship's advancement rights.[48]     Richard Verheij, Alpha's General Counsel, attended Cleary Gottlieb's

---

[44] *Id.* at 34-43. On March 10, 2015, a three-count Superseding Indictment was filed charging Blankenship with (i) conspiracy to willfully violate mandatory mine safety and health standards; (ii) making false statements to the SEC; and (iii) securities fraud. JX 54 (Superseding Indictment) at 34-41.

[45] Pre-Trial Stip. ¶ 2(2).

[46] *Id.* ¶ 2(23). The unpaid invoices include fees and expenses Blankenship's West Virginia counsel incurred in the Criminal Proceeding. JX 57 (Chart, Donald L. Blankenship – Outstanding Legal Expenses) at 1.

[47] JX 40 (Alpha Natural Resources, Inc., Meeting of the Board of Directors (Nov. 18-19, 2014)) at ANR_AAR-00000632.

[48] Pre-Trial Stip. ¶ 2(33).

presentation. Privilege has been asserted over the legal advice Cleary Gottlieb provided to Alpha.

After this board meeting, Verheij, who had joined Alpha only a few months earlier in August 2014,[49] "undertook to educate [him]self as to the nature of the company's obligation" to advance Blankenship's legal fees.[50] Verheij worked with Cleary Gottlieb to identify and review relevant documentation on this issue.[51] In connection with investigating potential derivative claims against Blankenship and other individuals on behalf of Alpha and representing Alpha in other proceedings arising out of the UBB explosion, Cleary Gottlieb had reviewed millions of Massey's internal documents and hundreds of audiotapes secretly recorded by Blankenship.[52]

Verheij's self-appointed inquiry was "whether there was a factual basis to review whether the company had a continuing obligation to advance fees to Mr. Blankenship."[53] He focused on any and all documents and audiotapes—or, more accurately, *excerpts* from documents and audiotapes—relevant to the factual representations in the Undertaking.

---

[49] *Id.* ¶ 2(34).

[50] Tr. 292 (Verheij).

[51] *Id.* 292-93 (Verheij).

[52] *Id.* 119-22 (Hou). There are approximately 1800 to 1900 audio recordings that Blankenship made from three recording devices installed in his office, which Alpha and Cleary Gottlieb learned about after the merger closed. *Id.*

[53] *Id.* 294 (Verheij).

16

Many of the documents Verheij and Cleary Gottlieb reviewed were not produced in this litigation on privilege grounds.[54]

While Verheij was compiling a list of potentially probative statements that Blankenship had made in writing or on tape, there were informal conversations among senior Alpha management about initiating a more official process to evaluate the Undertaking and the possibility of terminating Blankenship's advancement rights.[55] As one senior executive put it, "it was management's decision to – to entertain, evaluate and make whatever the appropriate decision was."[56] According to Verheij, this is how Alpha handled most litigation decisions.[57] Although it was within management's purview to make a decision on Blankenship's advancement rights, senior management nevertheless decided to consult the Massey Litigation Advisory Committee (the "MLAC"), a committee of the Alpha board established to advise the board with respect to legacy Massey litigation matters,[58] and the full board.[59]

On December 11, 2014, Verheij sent to Kevin Crutchfield, Alpha's Chief Executive Officer and Chairman, a memorandum entitled "Advancement of Blankenship

---

[54] *Id.* 143-44 (Hou).

[55] *Id.* 228-29 (Cavatoni).

[56] *Id.* 230 (Cavatoni).

[57] *Id.* 301-02 (Verheij).

[58] JX 42 at ANR_AAR-00001541; Tr. 299 (Verheij).

[59] Tr. 231 (Cavatoni).

Attorney Fees and Related Expenses" (the "Verheij Memo").[60] Consistent with Alpha's approach throughout this litigation, the legal advice included in the Verheij Memo relating to Blankenship's advancement rights was withheld on privilege grounds. To wit, seven of the twelve pages of the Verhiej Memo are entirely redacted except for a handful of headings, such as "Arguments with Respect to Advancement Obligation" and "Advantages and Disadvantages for Refusing to Make Further Advances."[61] Only the factual background section is not redacted.

The Verheij Memo contains an "illustrative" list of excerpted written and recorded statements by Blankenship[62] that, in Verheij's view, "appeared to be inconsistent with Mr. Blankenship's representation that he had no reasonable cause to believe that his conduct was ever unlawful."[63] Verheij selected these excerpts, which are dated from 2008 to 2010, based on materials Cleary Gottlieb provided to him when he joined Alpha.[64] The fact that Blankenship made these statements was important to Verheij because he thought a "reasonable person could characterize them as admissions."[65]

---

[60] JX 41 (Verheij Memo).

[61] *Id.* at ANR_AAR-00001528-29, 33-37.

[62] *Id.* at ANR_AAR-00001530-31.

[63] Tr. 294 (Verheij). Victor Hou of Cleary Gottlieb described these excerpts as "really by definition meant to be reminders to the MLAC of things that they had already seen or heard about and were not intended to be exhaustive." *Id.* 142 (Hou).

[64] Pre-Trial Stip. ¶ 2(35). Much of those materials were not produced in this litigation on privilege grounds.

[65] Verheij Dep. 79.

Verheij did not review the entirety of the underlying documents or the audiotapes from which the excerpts were taken.[66] Also listed in the Verheij Memo are excerpts from a June 2009 memorandum on Massey's compliance culture prepared by Bill Ross, a former federal regulator hired by Massey to work on mine safety issues.[67]

On December 13, 2014, two days after the Verheij Memo, Cleary Gottlieb provided a memorandum (the "Cleary Memo") to the MLAC that

> summarizes the relevant work performed to date by the [MLAC] to help the Committee evaluate the issue of whether Don Blankenship is entitled to further advancement of legal fees under the governing law and his contractual undertakings about such advancement following Mr. Blankenship's recent indictment by a grand jury in the Southern District of West Virginia.[68]

The Cleary Memo contains three sections: (i) a description and summary of several formal investigations into the UBB explosion, including the U.S. Attorney's investigation and the resulting Indictment; (ii) a summary of the MLAC's investigation into potential derivative claims; and (iii) a section entitled "Indemnification and Advancement of Attorneys' Fees." Everything included under this third section, which spanned roughly two pages, was withheld on privilege grounds.[69]

Appended to the Cleary Memo as "Appendix A" are the same excerpts of written statements, audiotape transcriptions, and the June 2009 Bill Ross memorandum that

---

[66] Tr. 311 (Verheij).

[67] JX 41 (Verheij Memo) at ANR_AAR-00001530-31; Tr. 150-51 (Hou).

[68] JX 42 (Cleary Memo) at ANR_AAR-00001538.

[69] *Id.* at ANR_AAR-00001543-45.

Verheij included in the earlier Verheij Memo.[70] The introduction to Appendix A states that the listed excerpts, though "not intended to be exhaustive of all relevant materials," are "certain evidence that may bear on Mr. Blankenship's representations in his April 2011 Undertaking that in the performance of his actions as an officer and director of Massey he . . . had no reasonable cause to believe his conduct was ever unlawful."[71]

On December 22, 2014, the MLAC held a telephonic meeting during which Cleary Gottlieb reviewed the Cleary Memo.[72] Verheij was on the line for this meeting. The MLAC was made aware that Alpha had not paid any of Blankenship's legal fees since the Indictment. After a discussion, the MLAC members

> indicated their support of management's determination that Mr. Blankenship is not entitled to indemnification under governing laws and management's proposal not to advance any further legal fees and expenses on Mr. Blankenship's behalf and . . . recommended that the matter also be discussed with the Board.[73]

At this point, Massey management had made no final determination to stop advancing Blankenship's legal fees.[74]

---

[70] *Id.* at ANR_AAR-00001546-49.

[71] *Id.* at ANR_AAR-00001546.

[72] JX 43 (Alpha Natural Resources, Inc., Telephonic Meeting of the Massey Litigation Advisory Committee of the Board of Directors (Dec. 22, 2014)) at ANR_AAR-00001520-21.

[73] *Id.* at ANR_ARR-00001521.

[74] Pre-Trial Stip. ¶ 2(37).

### J.    The Determination to Stop Advancing Blankenship's Legal Fees

On January 12, 2015, during a telephonic meeting of the full Alpha board, Cleary Gottlieb made another presentation concerning Blankenship's advancement rights. Privilege again was asserted over the minutes that reflect Cleary Gottlieb's legal advice on this subject. Based on the minutes that were produced, the Alpha board, like the MLAC, was supportive of management's approach in evaluating the Undertaking.[75] Several members of Alpha senior management were on the line for this meeting, including Verheij and Philip Cavatoni, an Executive Vice President of Alpha and its Chief Strategy Officer and Treasurer.

After this meeting, Crutchfield and Verheij agreed to designate Cavatoni to make a "determination" as to whether Massey should cease advancing Blankenship's legal expenses. Cavatoni was chosen in part because he held officer positions at each of the three companies (Massey, Performance and MCS) to which the Undertaking applied.[76] According to Defendants, he also was chosen because he had a working knowledge of mine safety regulations by participating in various Alpha committee meetings on sustainability and he was generally familiar with the facts and circumstances surrounding the UBB mine explosion and the "unique" amount of litigation it caused through his

---

[75] JX 44 (Alpha Natural Resources, Inc., Telephonic Meeting of the Board of Directors (Jan. 12, 2015)) at ANR_AAR-00001523; Tr. 235 (Cavatoni).

[76] Pre-Trial Stip. ¶ 2(39).

21

involvement in managing Alpha's pre-merger diligence and post-merger integration of Massey.[77]

Verheij informed Cavatoni of his new responsibility.[78] There is no evidence that anyone explicitly told Cavatoni to determine to stop advancing Blankenship's legal fees. Cavatoni testified that he was open to the possibility of concluding that Blankenship should continue receiving advancement.[79]

Cavatoni considered the merits of this task largely over a weekend.[80] The only document he had in hand to review was the Cleary Memo and the attached Appendix A.[81] He reviewed the Cleary Memo and Appendix A in a "holistic manner" without relying on "any one particular" excerpt.[82] He specifically considered the legal advice provided in

---

[77] Tr. 201-04, 213-15 (Cavatoni); Verheij Dep. 42-46. Cavatoni also had previously attended one MLAC meeting, but not the meeting of December 22, 2014, during which Cleary Gottlieb reviewed the Cleary Memo. Tr. 218 (Cavatoni); JX 43.

[78] Tr. 236 (Cavatoni).

[79] *Id.* 205-06 (Cavatoni); Cavatoni Dep. 25-26.

[80] Tr. 236 (Cavatoni).

[81] *Id.* 249 (Cavatoni). Cavatoni did not have the Undertaking in his possession, but he had previously reviewed it. *Id.* 250 (Cavatoni). Cavatoni was not familiar with the specifics of the Indictment. Cavatoni Dep. 68, 70, 86.

[82] Tr. 246 (Cavatoni); *id.* 260 (Cavatoni) ("When I evaluated these statements, I did it in a holistic manner in the context of the broader question. The focus wasn't a statement-by-statement analysis to try to make my determination. It was part of an evaluation. The statements are important, but each individual statement of itself, I didn't study it by itself and use it by itself to make the determination."); Cavatoni Dep. 55-56 ("[T]here's evidence that I reviewed, particularly with regard to safety, ventilation, roof bolting and other things where, as well as disclosure issues, where it was, in my judgment, it was evident that there was unlawful, what was going on was unlawful and that's, a lot of

22

the Cleary Memo under the heading "Indemnification and Advancement of Attorneys' Fees," which has been withheld on privilege grounds.[83]  The Appendix A excerpts were the focus of Cavatoni's attention because they "represented . . . Mr. Blankenship's words."[84]  The following examples are representative of the excerpts in Appendix A:

- "We have reached the point in Massey where no [one] has an Outlook that supports the number[s] that are given to the Board every quarter.  To me, this is an extremely dangerous violation of Sarbanes Oxley in achieving control of the assets and making consensus."  (Memo 8/28/2009).

- "We seem to be unable to record a single customer price properly in our outlooks and our budgets.  This raises grave concerns about control of our revenue and violations of Sarbanes Oxley."  (Memo 10/5/2009).

- "UBB could be a lot better than it is . . . .  All of you engineers think that planning for ventilation in the year 2015 is more important than survival of today, and believe me it's not.  You need to get low on UBB and run some coal.  We'll worry about ventilation or other issues at an appropriate time.  Now is not the time."  (Memo 4/3/2009).[85]

that's based on what was in Appendix A or those references in Appendix A. . . . [W]hen you evaluate these things and in my position I have a very good understanding of what is permitted and what isn't permitted with respect to some of these safety issues and disclosure issues.  And when I reviewed this information it was clear to me that what was going on and referenced here was not in compliance with what it needed to be in terms of the rules and regulations.").

[83] Tr. 257-58 (Cavatoni).

[84] *Id.* 276, 249-50 (Cavatoni); Cavatoni Dep 53-54.  He found the June 2009 Bill Ross memorandum excerpts to be "confirmatory" of the excerpts of Blankenship's statements. Tr. 247 (Cavatoni).

[85] JX 42 (Cleary Memo) at ANR_AAR-00001546-47.

Cavatoni did not review any of the documents or audiotapes from which the excerpts were taken,[86] nor did he did ask anyone else at Alpha or Cleary Gottlieb for additional information about the broader context of the excerpts.[87] Nonetheless, Cavatoni felt that he had been provided with sufficient information to reach an informed result.[88]

On January 29, 2015, Cavatoni had a half-hour phone call with Verheij and Victor Hou, a partner at Cleary Gottlieb. During the call, Cavatoni was given the opportunity to ask for additional information, but he did not do so. Hou read aloud one additional excerpt from an audiotape transcription of a January 19, 2010, phone call Blankenship had recorded.[89] The transcript Hou read from on January 29 appears to have been materially inaccurate.[90]

On January 29, after the phone call with Verheij and Hou, Cavatoni made the Determination that the Reasonable Cause Representation in the Undertaking was false. Specifically, Cavatoni determined "[t]hat Mr. Blankenship had reasonable cause to believe his conduct was unlawful and that [Massey] had the ability to cease advance

---

[86] Tr. 258, 263 (Cavatoni).

[87] *Id.* 303 (Verheij); Cavatoni Dep. 84.

[88] Tr. 205 (Cavatoni).

[89] *Id.* 236 (Cavatoni).

[90] The potentially problematic phrase "rewrite them" appears to have been improperly transcribed and should have stated "re-rock dust," which would have made the excerpt innocuous. *Id.* 155-56 (Hou); JX 18A (audio recording); *see generally* Pl.'s Pre-Trial Ans. Br. 32-34.

payments [of his legal expenses]."[91]  In reaching this conclusion, Cavatoni did not identify any specific law or regulation that he concluded Blankenship had reasonable cause to believe that he (Blankenship) had violated.[92]  Nor did Cavatoni believe that any such unlawful conduct needed to be based on or related to the allegations of the Indictment.[93]  When I asked Cavatoni at trial to elaborate on the basis for his Determination, he conceded he could not identify any specific examples of unlawful conduct by Blankenship and spoke in vague generalities.[94]

In memoranda dated January 29, 2015, Cavatoni documented the Determination for each of the three entities mentioned in the Undertaking.  Those memoranda state in identical language, except for the name of the entity, that:

> Based on a review of the available information and consultation with the counsel and the Board of [Massey], and consultation with the Board and MLAC of its ultimate parent, [Massey] has (a) determined that Don Blankenship had reasonable cause to believe that his conduct was unlawful and (b) accordingly, determined that based on the April 12, 2011 undertaking executed by Mr. Blankenship, advances to him of amounts for fees and expenses in respect of the criminal indictment against him should cease and he should repay all prior advances in respect of the criminal matter.[95]

Cavatoni did not make any determination on behalf of Alpha.[96]

---

[91] Tr. 202 (Cavatoni).

[92] *Id.* 274, 282 (Cavatoni).

[93] *Id.* 259 (Cavatoni).

[94] *Id.* 280-82 (Cavatoni).

[95] JX 45 (Memoranda from Philip J. Cavatoni to File (Jan. 29, 2015)).

[96] Pre-Trial Stip. ¶ 2(46).

25

On or about January 29, 2015, Cleary Gottlieb orally informed Zuckerman Spaeder that Massey was considering whether to terminate advancement of Blankenship's legal fees for the Criminal Proceeding.[97]  Taylor sought to meet with the decision-maker before the decision was final, but he was not permitted to do so.[98]  On February 2, 2015, Cleary Gottlieb emailed Zuckerman Spaeder to state that Massey would not advance Blankenship's defense costs incurred in connection with the Criminal Proceeding.[99]

Since the Determination, Zuckerman Spaeder has continued to submit invoices to Alpha to pay Blankenship's defense costs.  No such invoices have been paid.[100]

### K.    Blankenship Demands that Alpha Advance His Legal Fees

On February 18, 2015, after Blankenship initiated this action, his counsel at Zuckerman Spaeder sent a demand letter to Cleary Gottlieb requesting that Alpha advance Blankenship's defense costs incurred in connection with the Criminal Proceeding under Section 5.05(b) of the Merger Agreement.[101]  A form of undertaking

---

[97] *Id.* ¶ 2(43).

[98] Tr. 32 (Taylor).  Cavatoni was unaware of this request.  *Id.* 253-54 (Cavatoni).

[99] Pre-Trial Stip. ¶ 2(44).

[100] *Id.* ¶ 2(29).

[101] JX 47 (Letter from Graeme W. Bush of Zuckerman Spaeder to Victor Hou of Cleary Gottlieb (Feb. 18, 2015)).

was enclosed with this letter. On February 27, 2015, Blankenship sent to Alpha an executed undertaking in the same form (the "Alpha Undertaking").[102]

On March 2, 2015, Alpha rejected Blankenship's demand to advance his defense costs. The letter from Cleary Gottlieb stated, in relevant part:

> As you know, Blankenship has previously demanded advancement for such fees and costs, and executed an undertaking on April 12, 2011. Accordingly, advancement of fees and costs in relation to this matter is subject to the April 2011 undertaking and Alpha has no obligation to advance such fees and costs.
>
> Alpha welcomes the opportunity to address this matter more fully in Delaware Chancery Court.[103]

As of April 1, 2015, the date of the Pre-Trial Stipulation and Order in this action, Blankenship sought advancement of $5,808,885.64 in unpaid defense costs incurred in connection with the U.S. Attorney's investigation and the Criminal Proceeding.[104]

## L. Procedural History

On February 5, 2015, Blankenship filed the Complaint seeking advancement from Defendants. The Complaint asserts four counts for relief: (i) advancement under 8 *Del. C.* § 145 and Massey's Charter (Count I); (ii) advancement under the Engagement Letter (Count II); (iii) advancement under the Merger Agreement (Count III); and (iv)

---

[102] JX 48 (Alpha Undertaking).

[103] JX 49 (Letter from Victor L. Hou of Cleary Gottlieb to Graeme W. Bush of Zuckerman Spaeder (Mar. 2, 2015)).

[104] JX 57 (Zuckerman Spaeder invoices dated Dec. 31, 2014, Jan. 21, 2015, Feb. 26, 2015, and Mar. 12, 2015).

27

reimbursement of fees and expenses incurred in connection with this action (Count IV). On February 24, 2015, Defendants filed their Answer. Discovery ensued.

On March 12, 2015, for reasons explained in a bench ruling of that date, I entered a protective order providing, in part, that "Defendants shall not be permitted to introduce evidence at trial concerning the factual or legal merits of the Criminal Proceeding except any such evidence as possessed or considered by Defendants in connection with making the Determination."[105] On April 8, 2015, a one-day trial was held. On May 12, 2015, I heard post-trial oral argument. On May 14, 2015, the parties completed supplemental briefing on the issue of judicial estoppel.

## III. LEGAL ANALYSIS

### A. The Parties' Contentions Concerning Massey's Advancement Obligations Under its Charter

In Count I of the Complaint, Blankenship seeks advancement from Massey of his legal expenses relating to the investigation that led to the Indictment and his defense of the Criminal Proceeding under the Delaware General Corporation Law and Massey's October 2010 Amended and Restated Certificate of Incorporation (as defined above, the "Charter").[106] Under 8 *Del. C.* § 145(e), a corporation may advance "[e]xpenses (including attorneys' fees) incurred by an officer or director in defending any . . . action, suit or proceeding . . . in advance of the final disposition of such action, suit or

---

[105] Order Granting Pl.'s Mot. for a Protective Order ¶ 3 (Mar. 12, 2015).

[106] Massey's October 2010 Certificate of Incorporation contained the same language regarding advancement for officers and directors as its Certificate of Incorporation that was in force from November 2000 to October 5, 2010. Pre-Trial Stip.¶ 2(7); JX 1.

28

proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation." As to former directors and officers, the default rule in the statute is that "[s]uch expenses (including attorneys' fees) incurred by former directors and officers . . . may be so paid upon such terms and conditions, if any, as the corporation deems appropriate."[107]

Article Fifteenth of the Charter provides mandatory indemnification and advancement rights for a former Massey director or officer who becomes a party to a legal proceeding by reason of the fact that he or she was a director or officer of Massey:

> Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she . . . is or was a director or officer of the Corporation . . . *shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law . . . against all expense*, liability and loss *(including attorneys' fees . . . ) reasonably incurred* or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a director, [or] officer[.] . . . *The right to indemnification* conferred in this Article shall be a contract right and *shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition*; provided, however, that, if the Delaware General Corporation Law requires, the payment of such expenses incurred by a director or officer in his or her capacity as a director or officer . . . in advance of the final disposition of a proceeding, shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that such director

---

[107] 8 *Del. C.* § 145(e).

or officer is not entitled to be indemnified under this Article or otherwise.[108]

Defendants admit that Blankenship has been charged with crimes in the Criminal Proceeding by reason of the fact that he was a director and officer of Massey and certain affiliated companies.[109] Defendants, who had been advancing Blankenship's legal expenses in connection the U.S. Attorney's investigation before the Indictment, have further acknowledged throughout this case that Blankenship would be entitled to advancement under the Charter for the Criminal Proceeding but for the Determination Cavatoni made on behalf of Massey that the Reasonable Cause Representation in the Undertaking had been breached.[110] Thus, the key question in this case pertaining to Massey's advancement obligations is whether a breach of the Reasonable Cause Representation in the Undertaking is a proper basis for termination of Blankenship's advancement rights. The answer to this question depends on the meaning of the Contingency Provision in the Undertaking, which states in relevant part:

> It is my understanding that Massey will indemnify me and/or advance on my behalf the fees and costs associated with this representation, ***contingent upon*** the following factual representations and undertakings, which I hereby make and declare to be true [as defined above, the "Contingency Provision"]:
>
> . . .
>
> 2.     In the performance of my actions as an officer, director, employee, and consultant of Massey and/or any of its affiliates and

---

[108] JX 24 (Charter) at Art. Fifteenth.

[109] Pre-Trial Stip. ¶ 2(2).

[110] Defs.' Ans. Br. 1-25; *see also* Defs.' Opp'n to Mot. to Expedite Proceeding 4-6.

subsidiaries, including but not limited to MCS, *I had no reasonable cause to believe that my conduct was ever unlawful* [as defined above, the "Reasonable Cause Representation"][.][111]

Massey argues that the Contingency Provision can only reasonably be interpreted to mean that Massey's advancement obligations are "contingent upon the factual representations *themselves*, not merely a superficial recital of those representations, without regard to their truth."[112] Thus, according to Massey, because Blankenship "agreed that Massey's obligation to advance his fees was contingent upon the truthfulness of his factual representations in the Undertaking, [he] necessarily agreed that Massey would not be obligated to advance his fees if it determined that his factual representations were untrue."[113]

Massey concedes that its interpretation of the Undertaking would permit it to terminate Blankenship's advancement rights in at least three scenarios: (1) under the first part of the Termination Provision, if Blankenship should enter a plea of guilty, or be found guilty by a court or jury, on any criminal charge related to his actions as a director or officer of Massey; (2) under the second part of the Termination Provision, if Massey otherwise determined that Blankenship is not entitled to indemnification; and (3) under the Contingency Provision, if Blankenship "ever" should breach either of the listed

---

[111] JX 28 (Undertaking) at ANR_AAR-00000442.

[112] Defs.' Ans. Br. 10.

[113] *Id.*

31

factual representations, including the Reasonable Cause Representation.[114] Massey has not relied on either part of the Termination Provision as a basis to cease advancement.[115] The sole provision of the Undertaking upon which Massey relied in making the Determination was the Contingency Provision.

Blankenship counters that the only reasonable interpretation of the Contingency Provision is that "the obligation of Massey . . . to *commence* advancing depended upon Mr. Blankenship making 'the following factual representations and undertakings[.]' "[116] In other words, the enumerated factual representations, including the Reasonable Cause Representation, were simply assurances to Massey. Thus, he maintains that the Contingency Provision does not permit Massey to "stop advancing before the ultimate disposition of the underlying Criminal Proceeding if Massey later came to believe that the statements in numbered paragraphs 1 and 2 were not true."[117] For the reasons discussed below, I agree with Blankenship's interpretation of the Contingency Provision.

---

[114] Tr. of Oral Arg. 67-69. Although this issue is not ripe for judicial resolution, Massey also contends that, under the Undertaking, it may terminate Blankenship's indemnification rights in the same scenarios. Defs.' Ans. Br. 16.

[115] Tr. of Oral Arg. 67-69; *see also* Defs.' Ans. Br. 16 ("[Defendants] have not made, and may never make, a decision with respect to Mr. Blankenship's right to indemnification.").

[116] Pl.'s Op. Br. 11.

[117] *Id.*

**B.** **The Contingency Provision Does Not Permit Massey to Terminate Blankenship's Advancement Rights**

Because Blankenship's advancement rights under Massey's Charter are, by their terms, contract rights, I interpret the provisions of the Undertaking according to contract interpretation principles. Delaware law "adheres to the objective theory of contracts,"[118] which requires a court to interpret a particular contractual term to mean "what a reasonable person in the position of the parties would have thought it meant."[119] Delaware courts interpret a contractual term that is reasonably or fairly susceptible to only one interpretation according to the term's plain meaning.[120] That the parties dispute how to interpret a term does not mean that their interpretations are reasonable or that the term is ambiguous. Rather, only "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings" are the provisions deemed ambiguous.[121] If a contractual term is ambiguous, a Delaware court must consider extrinsic evidence "to determine the meaning the parties intended."[122] Applying these principles here, I find that a reasonable person in the position of the parties would not have thought that Blankenship's advancement rights

---

[118] *Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014) (citation omitted).

[119] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[120] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010).

[121] *See Rhone-Poulenc*, 616 A.2d at 1196.

[122] *Appriva S'holder Litig. Co., LLC v. ev3, Inc.*, 937 A.2d 1275, 1291 (Del. 2007).

could be terminated based on an alleged breach of the Reasonable Cause Representation for several, inter-related reasons.

First, when construing the Undertaking as a whole and giving meaning to each of its provisions,[123] Massey's interpretation is unreasonable because it equates the meaning and effect of the Contingency Provision with those of the Termination Provision. Those two provisions are structured differently and, in my opinion, were intended to serve different purposes. The Termination Provision explicitly lists certain situations in which Massey "shall not be obligated to . . . advance further fees" to Blankenship, namely, if (1) Blankenship enters a guilty plea or is found guilty by a court or jury related to his actions as a director or officer of Massey, or (2) Massey "otherwise determines" that Blankenship is not entitled to indemnification. Conspicuously absent from this list is any reference to the truthfulness of the two enumerated factual representations in the Undertaking. Applying the interpretive principle that "the expression of one thing is the exclusion of another,"[124] the plain terms and clear limitations of the Termination Provision demonstrate that the drafter of the Undertaking did not intend for the Contingency Provision to be a legal basis on which Massey could be relieved of advancing

---

[123] *See GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement."); *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.").

[124] *Miramar Police Officers' Ret. Plan v. Murdoch*, 2015 WL 1593745, at *8 (Del. Ch. Apr. 7, 2015) (citing *Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 (Del. Ch. 1999)).

Blankenship's legal fees. Only Blankenship's interpretation yields a different meaning for these different provisions.

Second, applying the definition of "contingent" from *Black's Law Dictionary*,[125] which defines "contingent" to mean "[d]ependent on something else; conditional,"[126] the Contingency Provision logically was intended to relate to the commencement of Massey's advancement obligations concerning the federal criminal investigation that began after the UBB explosion[127]—a topic that was not referenced in the earlier June 2010 undertaking[128]—and was not intended to provide a basis on which Massey could terminate those obligations. This conclusion is supported by the fact that the phrase "contingent upon" in the first paragraph of the Undertaking not only applied to the two enumerated factual representations of the Undertaking, but also applied to Blankenship's agreement to repay any advanced expenses in numbered paragraph 3 if it should

---

[125] *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

[126] *Black's Law Dictionary* at 362 (9th ed. 2009).

[127] Pre-Trial Stip. ¶ 2(19). The Undertaking expressly references that Blankenship had retained counsel to represent him in connection with "a federal grand jury investigation conducted by the Office of the United States Attorney for the Southern District of West Virginia and agents of the Federal Bureau of Investigation and Federal Mine Safety and Health Administration." JX 28 (Undertaking) at ANR_AAR-00000442.

[128] In the June 2010 undertaking, Blankenship requested advancement for expenses incurred "in connection with litigation regarding the Company's compliance with environmental and safety regulations, including but not limited to derivative actions alleging breaches of fiduciary duties on the part of the Company's Board of Directors and certain executives, federal securities, litigation and various shareholder demands." JX 22.

ultimately be determined that he is not entitled to indemnification. Blankenship's undertaking of such a repayment obligation plainly did not provide a basis on which Massey could later terminate its advancement obligations; it simply provided an assurance that Blankenship would repay if it ultimately should be determined that he is not entitled to indemnification. It would be nonsensical to construe the phrase "contingent upon" differently with respect to the two factual representations in numbered paragraphs 1 and 2 to which it applies than with respect to the agreement to repay in numbered paragraph 3 to which it also applies.[129] Thus, the use of the phrase "contingent upon" logically could not have been intended to provide Massey a license to terminate its advancement obligations in the future. Instead, "contingent upon" can only reasonably be interpreted to require that Blankenship provide certain assurances as a condition to Massey agreeing to commence advancement for the federal criminal investigation.

The foregoing interpretation of the Contingency Provision is consistent with then-Vice Chancellor Strine's comments about the import of functionally equivalent language in the undertaking at issue in *Thompson v. Williams Companies, Inc.*[130] In that case, a former employee (Thompson) of Williams Power Company (Power) challenged as unreasonable the terms of a proposed undertaking that Power sought as a condition to

---

[129] *See Comerica Bank v. Global Payments Direct, Inc.*, 2014 WL 3567610, at *11 (Del. Ch. July 21, 2014) ("Absent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract." (citing, *inter alia*, *In re Mobilactive Media, LLC*, 2013 WL 297950, at *19 (Del. Ch. Jan. 25, 2013)).

[130] 2007 WL 3326007 (Del. Ch. July 31, 2007).

granting advancement of Thompson's legal expenses for a criminal investigation and proceeding. Similar to the Undertaking here, Power's proposed undertaking included representations that Thompson "acted at all times as an employee . . . of [Power] in good faith and for a purpose that [he] reasonably believed to be in the best interests of [Power] and/or any related entities," and that he "ha[s] no reasonable cause to believe [his] conduct was unlawful at any time."[131] Power's advancement bylaw provided, in part, that "[e]xpenses incurred by other employees and agents shall be paid upon such terms and conditions, if any, as the Board of Directors deems appropriate."[132]

In determining that Power had the legal authority under the company's bylaws to condition advancement to Thompson (a former employee) upon "appropriate" terms and conditions, then-Vice Chancellor Strine interpreted "appropriate" in that context to mean "rationally related to a proper corporate interest."[133] He then observed that the good faith and reasonable cause representations in the proposed undertaking qualified as "appropriate" terms and conditions because he read each to be a "reassuring prerequisite" necessary for advancement to commence rather than as a "license" for the company to cease continued advancement:

> Power's demand that Thompson certify that he acted in a manner that was consistent with his ultimate entitlement to indemnification was also appropriate. By that means, Power simply demanded that Thompson evidence his personal belief that he had acted in a manner entitling him to

---

[131] *Id.* at *2.

[132] *Id.* at *1.

[133] *Id.* at *6.

indemnification under the plain terms of the Indemnification Bylaw. The Power board knew that the federal authorities had procured an indictment charging Thompson with having engaged in conduct that cannot be indemnified; it simply wanted Thompson to certify that he believes himself to have acted lawfully and faithfully. That may seem useless to those of a cynical bent, but I do not believe it inappropriate for the Power board to desire an attestation of good faith from a former employee facing serious criminal charges before extending him hundreds of thousands of dollars in interest-free credit.

. . .

I do not read the condition that Thompson certify that he believes his past behavior as an employee of Power entitles him to ultimate indemnification as giving Power a license to deny him further advancement if it concludes he lied before his criminal prosecution is concluded. Rather, I read it as manifesting the board's demand for an affirmative representation by Thompson of his own belief in the good faith and legality of his actions while an employee as a reassuring prerequisite to advancing him company funds.[134]

Similarly here, the Contingency Provision, construed logically, makes sense as a form of reassurance to Massey, but not as a license for Massey to deny Blankenship further advancement if he "ever" had reasonable cause to believe that any action he took arising from his actions as an officer, director or employee of Massey was unlawful.[135]

---

[134] *Id.* at *7-8. Massey seeks to distinguish *Thompson* because the undertaking there merely asked Thompson to "confirm[] and agree[]" to the factual representations and did not make advancement "contingent upon" those representations. Defs.' Ans. Br. 11; Defs.' Ans. Br. Ex. A. In my view, the "confirm and agree" language on which Massey relies to distinguish the undertaking at issue in *Thompson* is not a readily identifiable basis for the Court's discussion about the limited nature of the representations in that case. In any event, the phrase "contingent upon" does not have the meaning Massey ascribes to it for the reasons stated above.

[135] The Undertaking applies jointly to Massey, a Delaware corporation, and to Performance and MCS, both of which are West Virginia corporations. The statutory requirements for advancement under West Virginia law offer a logical and plausible explanation for why the factual representations appear in the Undertaking, and that

38

Third, Massey's interpretation of the Contingency Provision would afford it such broad discretion to cease advancement of Blankenship's legal expenses so as to lead to absurd results that, in my view, "no reasonable person would have accepted" when executing the Undertaking.[136] An example discussed by counsel at post-trial argument demonstrates the point. Say that Massey found an audiotape in which Blankenship is recorded as saying that, while driving a truck to inspect one of Massey's coal mines, he exceeded the legal speed limit. Counsel for Massey conceded at argument that, based on such an audiotape, and subject to a good faith and reasonableness standard, the company would be permitted under its interpretation of the Undertaking to cease advancement for Blankenship's fees in the Criminal Proceeding, even if (1) the speeding is wholly unrelated to any of the claims for which Blankenship seeks advancement; (2) a police

---

explanation is consistent with construing them as reassurances and not as a basis for terminating advancement. Under Section 853(a)(1) of the West Virginia Business Corporation Act, a corporation may advance legal expenses to a director upon delivery of "a written affirmation of his or her good faith belief that he or she has met the relevant standard of conduct described in section eight hundred fifty-one of this article." W. Va. Code § 31D-8-853(a)(1). Section 851(a) provides, in relevant part, that "a corporation may indemnify an individual who is a party to a proceeding because he or she is a director against liability incurred in the proceeding if: (1) . . . (B) He or she reasonably believed: (i) In the case of conduct in his or her official capacity, that his or her conduct was in the best interests of the corporation; . . . and (C) In the case of any criminal proceeding, he or she had no reasonable cause to believe his or her conduct was unlawful." W. Va. Code § 31D-8-851(a). A West Virginia corporation may indemnify and advance legal expenses to an officer "[t]o the same extent as a director." W. Va. Code § 31D-8-856(a)(1). I have not considered the terms of any advancement provisions in the charters of Performance or MCS.

[136] *See Osborn*, 991 A.2d at 1160 ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

officer who was nearby did not pull Blankenship over for speeding; or (3) Blankenship actually was not speeding, even though he thought he was.[137] This example, which flows from the logic of Massey's proffered interpretation, demonstrates the unreasonableness of its construction of the Undertaking.

For the reasons discussed above, I conclude that Blankenship has provided the only reasonable interpretation of the Contingency Provision. Even if the Contingency Provision arguably was ambiguous, however, the weight of the evidence surrounding the drafting and execution of the Undertaking, although limited, also supports Blankenship's interpretation as does the public policy of Delaware, which supports resolving ambiguity in favor of indemnification and advancement.

Under Delaware law, extrinsic evidence that is probative of the meaning of an ambiguous contractual term includes "the overt statements and acts of the parties, the business context, prior dealings between the parties, and the business customs and usage in the industry."[138] As noted above, the parties never discussed the meaning of the Undertaking when it was first proposed or later executed. Thus, Blankenship's and Taylor's testimony about their subjective understandings of the Undertaking is not

---

[137] Tr. of Oral Arg. 41-43, 46-47.

[138] *Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.*, 1995 WL 707916, at *6 (Del. Ch. Nov. 28, 1995).

probative of the parties' shared understanding of the meaning and effect of the Undertaking.[139]

The only contemporaneous documentary evidence concerning the Undertaking is Ojeda's cover letter to Taylor, in which she wrote that the Undertaking "***clarifies*** the relationship between Massey and your client(s) with respect to their legal representation in this matter and payment therefor."[140] In ordinary usage, the word "clarify" means "make (a statement or situation) less confused and more clearly comprehensible."[141] Applying that definition here, and in the absence of any contrary evidence on the subject, I do not believe a reasonable person would construe the term "clarify" to mean that Massey would be afforded sweeping discretion to terminate Blankenship's advancement rights in ways it indisputably had no legal right to demand. Stated more directly, saying that Massey's interpretation of the Contingency Provision "clarifies" Massey's advancement obligations to Blankenship would be a gross mischaracterization given that

---

[139] *See United Rentals, Inc. v. RAM Hlgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) ("[T]he private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common.").

Because privilege was asserted over the advice Zuckerman Spaeder gave Blankenship concerning the Undertaking, I give no weight to the circumstances of that advice, although the non-privileged fact that Zuckerman Spaeder reviewed the Undertaking for one hour in total tends to support the inference that no one at the firm thought that the Contingency Provision was intended to have the effect that Massey advocates here.

[140] JX 27 (emphasis added).

[141] *New Oxford American Dictionary* at 319 (3d ed. 2010).

41

such an interpretation would represent a highly unusual and fundamental change of his advancement rights.

Additionally, Ojeda testified that the Undertaking was intended as a "confirmation" or "restatement" of Massey's advancement obligations to Blankenship, which "had already been established."[142] Defendants did not present any contemporaneous, conflicting evidence.[143] Ojeda's unrebutted testimony thus accords with my reading of the cover letter and undermines Massey's argument that the Contingency Provision was intended to fundamentally alter Blankenship's advancement rights.[144]

Finally, as this Court observed in *Miller v. Palladium Industries, Inc.*[145] and elsewhere, Delaware's salutary public policy of "attracting the most capable people into

---

[142] Ojeda Dep. 32-33.

[143] *See Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *42 (Del. Ch. May 13, 2013) ("No CalPERS employee testified to what the parties did intend when they negotiated the Management Agreements, and this undercuts CalPERS' argument." (citing *Smith v. Van Gorkom*, 488 A.2d 858, 878 (Del. 1985))).

[144] Massey contends that, in agreeing to the Contingency Provision, Blankenship voluntarily agreed to make conditional the mandatory advancement rights to which he would otherwise be entitled. Defs.' Ans. Br. 21-25. I disagree. Under Delaware law, "[w]aiver is the voluntary and intentional relinquishment of a known right," and the evidence of a waiver "must be unequivocal in character." *Realty Growth Investors v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982). For the reasons discussed above, the Contingency Provision does not unambiguously mean what Massey interprets it to mean. At most, the Contingency Provision is ambiguous, but "[a] waiver will not be implied based on ambiguous acts." *Dirienzo v. Steel P'rs Hldgs. L.P.*, 2009 WL 4652944, at *5 (Del. Ch. Dec. 8, 2009).

[145] 2012 WL 6740254 (Del. Ch. Dec. 31, 2012), *aff'd*, 72 A.3d 502 (Del. 2013) (ORDER).

corporate service"[146] through broad indemnification and advancement protections supports resolving ambiguity in an instrument governing advancement rights in favor of advancement.[147]   The Supreme Court has described advancement as "provid[ing] corporate officials with immediate interim relief from the personal out-of-pocket financial burden of paying the significant on-going expenses inevitably involved with investigations and legal proceedings."[148]  Against this public policy backdrop, I find the present circumstances—where Massey exclusively drafted the Undertaking and never gave Blankenship fair notice that it intended for the Undertaking to fundamentally alter his right to advancement—support interpreting any ambiguity in the Undertaking in favor of Blankenship's advancement rights.   Thus, if the Contingency Provision were ambiguous, I would construe the provision against Massey and adopt Blankenship's interpretation on this alternative ground.

* * * * *

For the reasons discussed above, I conclude that the Contingency Provision in the Undertaking does not afford Massey a legal basis on which to terminate Blankenship's

---

[146] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 218 (Del. 2005).

[147] *Miller*, 2012 WL 6740254, at *3 ("Delaware policy favors indemnification and advancement as a means of attracting qualified individuals to serve in important corporate capacities.  That policy supports the approach of resolving ambiguity in favor of indemnification and advancement."); *see also Sun-Times*, 954 A.2d at 404 ("[T]o the extent there is any ambiguity in the meaning of final disposition in the advancement context, the Delaware policy gloss favoring advancement to corporate officials supports resolving that ambiguity in favor of advancement[.].").

[148] *Homestore*, 888 A.2d at 211.

43

right to advancement under the Charter. Massey has advancement obligations to Blankenship for the Criminal Proceeding under the Charter, and, as I note below,[149] those obligations survived the merger under Section 5.05(a) of the Merger Agreement. As such, the Determination had no legal force, and I thus do not need to decide whether it was "based on reasonable grounds and made in good faith,"[150] which the parties agree to be the operative standard of review.[151]

## C. The Engagement Letter Does Not Provide Blankenship with an Independent Basis for Advancement

In Count II of the Complaint, Blankenship seeks to recover his unpaid legal expenses under the Engagement Letter that was counter-signed by Massey's General

---

[149] *See infra* Part III.D.

[150] Pl.'s Op. Br. 34; Defs.' Ans. Br. 34; *see also ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 441 (Del. Ch. 2012) ("When exercising a discretionary right, a party to the contract must exercise its discretion reasonably."), *rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013).

[151] Although I reach no conclusion whether this standard was met, I feel I would be remiss not to express my serious doubts that the Determination was reasonable. Based on the manner in which Verheij selected the excerpts that became Appendix A of the Cleary Memo—without reviewing the underlying documents or audiotapes in context—it appears that the materials provided to Cavatoni were cherry-picked to lead to a preordained conclusion. The evidence at trial also demonstrated the obvious importance of context in considering those excerpts. When Cavatoni was confronted on cross-examination by additional documentary evidence and additional segments of audiotape to contextualize various excerpts in Appendix A—materials he was not provided and had not reviewed in making the Determination—the import of those excerpts took on an entirely different meaning. Further complicating matters, privilege was asserted over Cleary Gottlieb's advice to the MLAC, to Alpha management, and to Cavatoni individually, even though Defendants not so subtly sought to bolster the reasonableness of the Determination based on the work Cleary Gottlieb had done on Alpha's behalf. This placed Blankenship in an unfair position at trial and left the Court with a cramped picture of the process leading to the Determination.

44

Counsel. Specifically, Blankenship contends that the Engagement Letter "established an unambiguous contractual obligation separate and apart from any obligations assumed through the [Charter] or the Merger Agreement."[152] I disagree.

The key sentence of the Engagement Letter upon which Blankenship relies is the statement that "Massey Energy Company agrees to pay all fees and expenses incurred within thirty days of the date of any invoice."[153] In my opinion, the only reasonable interpretation of this language,[154] included in a document whose express purpose was to "set forth in writing the basis of [Zuckerman Spaeder's] fees at the beginning of a representation" in accordance with the District of Columbia Rules of Professional Conduct,[155] is the one Massey proffers, *i.e.*, that the Engagement Letter sets forth nothing more than the agreed-upon invoice terms and payment schedule under which Zuckerman Spaeder would bill Massey and Massey would pay Zuckerman Spaeder.[156]

Taken to its logical extreme, interpreting the Engagement Letter to be an unconditional commitment for Massey to pay Blankenship's legal fees without regard to the reasonableness of the fees or any nexus between the legal services performed and Blankenship's conduct as a current or former director or officer of Massey would

---

[152] Pl.'s Op. Br. 27.

[153] JX 21 (Engagement Letter) at DBDEL0010.

[154] Because the parties have not briefed the conflict of laws issue, I construe the Engagement Letter as if it were governed by Delaware law.

[155] *Id.* at DBDEL0009.

[156] Defs.' Ans. Br. 25-26.

produce absurd results that no reasonable person would accept.[157]  Indeed, given that the Engagement Letter does not limit Massey's payment obligations by reference to whether Blankenship is ultimately entitled to indemnification under the Charter or Delaware law, his argument about its meaning is untenable because such an unconditional payment obligation would exceed the scope of indemnification that a Delaware corporation may lawfully undertake.[158]  Therefore, I find that Defendants are entitled to judgment in their favor under Count II.

### D. Blankenship has Advancement Rights against Alpha for the Criminal Proceeding under Section 5.05(b) of the Merger Agreement

In Count III of the Complaint, Blankenship seeks advancement from Alpha of his legal expenses incurred in the Criminal Proceeding under Section 5.05(b) of the Merger Agreement.  That section sets forth the advancement and indemnification obligations that Alpha (defined as "Parent") owes to the defined "Indemnified Parties," which include Blankenship as a former director and officer of Massey:

> Without limiting Section 5.05(a) or any rights of any Indemnified Party pursuant to any indemnification agreement, from and after the Effective Time, in the event of any threatened or actual claim, action, suit, proceeding or investigation (a "Claim"), whether civil, criminal or administrative in which any person who is now, or has been at any time

---

[157] *See Osborn*, 991 A.2d at 1160.

[158] *See, e.g.*, *Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 404 n.93 (Del. Ch. 2008) ("[A]s far as § 145 is concerned, Delaware corporations lack the power to indemnify a party who did not act in good faith or in the best interests of the corporation." (citation omitted)).  Although I find the Engagement Letter to be unambiguous, my interpretation of that document is further supported by Blankenship's deposition testimony, where he conceded that he did not think he obtained broader indemnification or advancement rights by signing the Engagement Letter than those he already had.  Blankenship Dep. 48-49.

46

prior to the date of this Agreement, . . . a director or officer of the Company is or is threatened to be, made a party in his or her capacity as a director or officer of the Company, each of Parent and the Surviving Corporation shall indemnify and hold harmless, to the fullest extent the Company would have been permitted to do so under applicable Law (for the avoidance of doubt, subject to the limitations on the Company's ability to indemnify its directors and officers under Section 145 of the DGCL), each such Indemnified Party in his or her capacity as a director or officer of the Company or any of its Subsidiaries, or any of their respective predecessors, against any losses, claims, damages, liabilities, costs, expenses (including reasonable attorney's fees and expenses in advance of the final disposition of any Claim to each Indemnified Party to the fullest extent permitted by Law upon receipt of any undertaking in favor of Parent and the Surviving Corporation of a type contemplated by the Company Certificate of Incorporation), judgments, fines and amounts paid in settlement of or in connection with any such threatened or actual Claim, arising out of, or pertaining to (i) the fact that such an Indemnified Party was a director . . . or officer of the Company . . . , prior to the Effective Time or (ii) this Agreement or any of the transactions contemplated hereby, whether in any case asserted or arising before or after the Effective Time.[159]

Because the Merger Agreement is governed by Delaware law,[160] the same contract interpretation principles discussed above apply in determining whether Alpha has advancement obligations to Blankenship for the Criminal Proceeding under the Merger Agreement. Section 5.05(e) of the Merger Agreement states that the "provisions of Section 5.05 are intended to be for the benefit of, and will be enforceable by, each Indemnified Party."[161] Thus, Blankenship has standing to enforce the provision.

The parties' arguments regarding Section 5.05(b) implicate two textual issues concerning the temporal scope of the provision. The first issue is premised on the

---

[159] JX 26 (Merger Agreement) at § 5.05(b) (emphasis added).

[160] *Id.* at § 8.08.

[161] *Id.* at § 5.05(e).

interaction of Section 5.05(b) with Section 5.05(a). That earlier section generally provides that Blankenship's indemnification and advancement rights from Massey (not Alpha) for "acts or omissions occurring at or prior to the Effective Time" of the merger—which was June 1, 2011—shall survive the merger:

> ***All rights to indemnification and exculpation from liabilities for acts or omissions occurring at or prior to the Effective Time and rights to advancement of expenses relating thereto*** now existing in favor of any person who is . . . , or has been at any time prior to the date of this Agreement, a director, officer, employee or agent . . . of the Company, any of its Subsidiaries or any of their respective predecessors (each, an "Indemnified Party") as provided in the Company Certificate of Incorporation, the Company Bylaws, the organizational documents of any Subsidiary of the Company or any indemnification agreement between such Indemnified Party and the Company or any of its Subsidiaries . . . ***shall survive the Merger*** and shall not be amended, repealed or otherwise modified in any manner that would adversely affect any right thereunder of any such Indemnified Party without the consent of such Indemnified Party.[162]

Thus, under Section 5.05(a), Massey's advancement obligations to Blankenship for the U.S. Attorney's investigation and the resulting Criminal Proceeding survived the merger. Relying on language appearing at the beginning of Sections 5.05(a) and (b), respectively, Alpha argues that Section 5.05(a) was intended to cover claims based on conduct (*i.e.*, "acts or omissions") occurring "prior to the Effective Time" while Section 5.05(b) was intended to cover claims based on conduct occurring "from and after the Effective Time."[163] In effect, Alpha contends that Sections 5.05(a) and (b) are mutually

---

[162] *Id.* at § 5.05(a) (emphasis added).

[163] Defs.' Ans. Br. 28-30.

exclusively with the line of demarcation between the two being when the underlying conduct that forms the basis of a claim occurred.

This argument is plainly without merit. Alpha has not identified any text in the Merger Agreement stating that the Section 5.05(a) and (b) were intended to be mutually exclusive based on the timing of underlying conduct. To the contrary, Section 5.05(b) contains explicit language demonstrating that it was intended to cover claims relating to conduct occurring before the Effective Time. Specifically, Section 5.05(b) encompasses claims "arising out of, or pertaining to (i) the fact that such an Indemnified Party was a director … or officer of [Massey] . . . prior to the Effective Time." That does not mean that Section 5.05(b) necessarily covers all claims relating to the conduct of a Massey director or officer occurring before the Effective Time, just that such a claim may be encompassed by Section 5.05(b) if the other conditions of that section are met.

The second temporal issue implicated by Section 5.05(b) focuses on when a claim is asserted as opposed to when the underlying conduct occurred. Alpha acknowledges that Section 5.05(b) of the Merger Agreement "obligates [it] to advance fees to the former Massey directors and officers for new claims, meaning claims that are threatened or instituted after the Effective Time of the merger, on June 1, 2011."[164] But, Alpha argues that the fact that Blankenship "was indicted in November 2014 did not somehow create a 'new' claim that would fall under the scope of Section 5.05(b)."[165]

---

[164] *Id.* 29.

[165] *Id.* 30.

49

In my opinion, although Alpha glosses over the actual language of Section 5.05(b), it is half right. As I construe Section 5.05(b), it generally covers actions or proceedings in which an Indemnified Party is made or threatened to be made a party "from and after the Effective Time."[166] This conclusion follows from the text of Section 5.05(b) emphasized below:

> . . . *from and after the Effective Time, in event of any threatened or actual* claim**,** *action, suit, proceeding* or investigation (a "Claim")**,** whether civil, criminal or administrative *in which any person … is or is threatened to be, made a party* in his or her capacity as a director or officer of the Company, each of Parent [Alpha] and the Surviving Corporation [Massey] shall indemnify and hold harmless, to the fullest extent the Company would have been permitted to do so under applicable Law . . . , each such Indemnified Party in his or her capacity as a director or officer of the Company . . . against any losses, claims, damages, costs, expenses (including reasonable attorney's fees and expenses in advance of the final disposition of any Claim to each Indemnified Party . . . ) . . . .[167]

I disagree with Alpha's assertion, however, that the Indictment did not trigger coverage for the Criminal Proceeding under Section 5.05(b). Blankenship was made a party to the Criminal Proceeding by virtue of the Indictment, which was issued on November 13, 2014. Thus, he became a party to a criminal proceeding after the Effective Time and is thereby entitled to advancement from Alpha under the plain language of Section 5.05(b) as long as the conduct for which he was charged falls within the scope of the type of conduct covered by Section 5.05(b). For the reasons discussed above, the conduct for

---

[166] Section 5.05(b)(ii) contains an exception. That subpart covers claims arising out of or pertaining to the Merger Agreement or any of the transactions contemplated thereby "whether in any case asserted or arising before or after the Effective Time." JX 26 (Merger Agreement) at § 5.05(b)(ii).

[167] *Id.* at § 5.05(b) (emphasis added).

which he now has been charged criminally falls within the scope of Section 5.05(b) because it indisputably arises out of and pertains to the fact that he was a director and officer of Massey before the Effective Time.[168]

Alpha has offered no textual support for the notion that the Criminal Proceeding to which he was made a party by virtue of the Indictment should relate back to the U.S. Attorney's criminal investigation for which Massey was providing advancement to Blankenship before the Effective Time so as to remove the Criminal Proceeding from the ambit of Section 5.05(b).[169] Had the drafters of the Merger Agreement intended to incorporate a relation-back limitation on Alpha's advancement and indemnification obligations, they presumably could have done so. But they did not. Instead, they drafted Section 5.05(b) so that it would cover certain proceedings in which an Indemnified Person is made a party to a proceeding after the Effective Time arising out of or relating to his or her conduct as a Massey director or officer before the Effective Time. The Criminal Proceeding is such a proceeding.

To summarize, taking into account the two temporal issues concerning the construction of Section 5.05(b) discussed above, Blankenship is entitled to advancement from Alpha for the Criminal Proceeding under that section because (1) the Indictment was handed down on November 13, 2014, meaning that Blankenship was made a party to

---

[168] Pre-Trial Stip. ¶ 2(2).

[169] The merger closed in June 2011. As reflected by the Undertaking, which Blankenship signed on April 12, 2011, Massey agreed to advance Blankenship "in connection with a federal criminal grand jury investigation" before the Effective Time. JX 28 (Undertaking) at ANR_AAR-00000442.

the Criminal Proceeding after the Effective Time; and (2) Section 5.05(b)(i) plainly covers the claims asserted in the Criminal Proceeding, which pertain to or arise out of the fact that Blankenship was a director or officer of Massey before the Effective Time.

Alpha next contends that, under the equitable doctrine of judicial estoppel, Blankenship should be precluded from contradicting the interpretation of Section 5.05 he allegedly supported in *Massey Energy Co.*[170] The equitable doctrine of judicial estoppel is "designed to protect the integrity of the judicial process by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.' "[171] In *Motorola Inc. v. Amkor Technology, Inc.*,[172] the Delaware Supreme Court explained that "judicial estoppel operates only where the litigant contradicts another position that the litigant previously took *and* that the Court was successfully induced to adopt in a judicial ruling."[173] That doctrine has no application here, in my opinion, because neither of the elements required under *Motorola* are present.

Regarding the first element, Massey relies on two representations that were made in defending against the issuance of a preliminary injunction in *Massey Energy Co.* The first is a segment of a brief submitted in opposition to the stockholders plaintiffs' preliminary injunction motion, which Blankenship joined. It states that:

---

[170] Defs.' Ans. Br. 29 n.23.

[171] *In re Silver Leaf, L.L.C.*, 2004 WL 1517127, at *2 (Del. Ch. June 29, 2004).

[172] 958 A.2d 852 (Del. 2008).

[173] *Id.* at 859-60 (citation omitted).

Under the Merger Agreement, Massey's directors, officers and employees are indemnified by Massey (not Alpha) for acts or omissions occurring before the merger to the same extent they were before the merger. ([Merger Agreement] §5.05(a)). With respect to new claims, they are indemnified by Massey and Alpha to the same extent they were indemnified by Massey pre-merger. (*Id.* §5.05(b)). In other words, the Merger Agreement provides Defendants with no greater indemnity than they would have received if [Massey] continued as an independent entity.[174]

This quotation essentially rehashes the argument Alpha has asserted in this case. It does not, however, contradict the interpretation of Section 5.05 Blankenship has advanced, and which I have adopted, here—namely, that Blankenship is entitled to advancement from Alpha for the Criminal Proceeding under Section 5.05(b) because he was made a party to that proceeding after the Effective Time for actions he took as a director and officer of Massey before the Effective Time.

The second representation comes from the following colloquy at oral argument on the preliminary injunction motion between the Court and Alpha's counsel:

> The Court: Can – can you go over your understanding of the indemnity that your clients have granted?
>
> [Alpha's Counsel]: Yes. And I don't think that this – well – yes. There are two provisions in the merger agreement that deal with indemnity. One is 5.05(a), and the second is 5.05(b). 5.05(a) is the provision that addresses causes of action existing prior to the signing of the merger agreement. There is no dispute that these derivative claims were existing prior to the merger agreement. And 5.05(a) says that the indemnity for those claims and any others presigning of the merger agreement will remain postmerger Massey's obligation. Obviously Massey will be a subsidiary of Alpha, but it will be Massey's indemnification. That's my

---

[174] JX 31 (Certain Massey Defs.' Ans. Br. in Opp'n to Pls.' Mot. for a Prelim. Inj.) at ANR_AAR-00000793-94.

view. That's what we argued in our brief to Your Honor, and that's what Massey argued in their brief to Your Honor at pages 42 –

The Court: So there is no indemnity from Alpha as a parent company –

[Alpha's Counsel]: On these claims, no, no. And the two signatories to that contract agree that that is how it reads.

There is a separate provision, 5.05(b), which applies to claims threatened or brought after the signing of the merger agreement.[175]

The claims for which Alpha's counsel was denying that Alpha would have any indemnification obligations were the derivative claims that had been asserted before the Effective Time in the case before the Court. Nothing in this colloquy, which did not even involve statements made by Blankenship's counsel, contradicts the interpretation of Section 5.05 Blankenship has advanced here. Indeed, at the end of the colloquy quoted above, Alpha's counsel explicitly recognized that Section 5.05(b) would apply to "claims threatened or brought after the signing of the merger agreement."

Finally, from my reading of the Court's decision in *Massey Energy Co.*, then-Vice Chancellor Strine did not adopt an interpretation of Section 5.05(b) of the Merger Agreement that is contrary to Blankenship's position in this case. The reason Section 5.05 was relevant in *Massey Energy Co.* was because plaintiffs had argued, based on a draft of a merger agreement Massey's counsel had prepared, that Alpha, as a third party, was agreeing to indemnify Massey's management and directors beyond the extent to

---

[175] Letter from Matthew E. Fischer at Ex. 1 (May 13, 2015). Alpha's counsel's reference to the "two signatories" to the Merger Agreement refers to Alpha and Massey and does not refer to Blankenship, who had retired from Massey by that time and was not a signatory to the Merger Agreement.

which Massey itself would have been permitted to do so under Delaware law such that, for example, they would be indemnified for breaches of the fiduciary duty of loyalty involving scienter. After analyzing the record, then-Vice Chancellor Strine rejected this argument as a basis for injunctive relief because Section 5.05(b) of the final Merger Agreement only required Alpha to indemnify Massey's directors and officers "to the fullest extent [Massey] would have been permitted to do so under applicable Law (for the avoidance of doubt, subject to the limitations on [Massey's] ability to indemnify its directors and officers under Section 145 of the DGCL)":[176]

> I have carefully considered the plaintiffs' argument that a January 2011 draft of the Merger Agreement, written by Cravath [Massey's counsel], supports the inference that the Board sought to sell the company to avoid personal liability for the Derivative Claims. . . . [T]he draft Cravath sent to Alpha was one that required Alpha to indemnify the Massey defendants for any claim asserted against them in their capacity as Massey directors or officers "to the fullest extent permitted by Law." Alpha's counsel flagged this as something that would need to be changed in any definitive merger agreement because the draft merger agreement's indemnification provision arguably could have allowed Alpha, because it was a third-party and not Massey itself, to indemnify former Massey management and directors beyond the extent Massey itself would have been permitted under Delaware public policy and statutory law. To wit, Crutchfield's advisors must have told him that the draft arguably could have required Alpha to indemnify Massey fiduciaries for breaches of the fiduciary duty of loyalty involving scienter, such as claims involving willful misconduct. Massey conceded this point in the negotiations, and the issue was resolved when both parties agreed to an indemnification provision that would require Alpha to indemnify the Massey directors and officers, "from and after the Effective Time," only "to the fullest extent [Massey] would have been permitted to do so under applicable Law (for the avoidance of doubt, subject to the limitations on [Massey's] ability to indemnify its directors and officers under Section 145 of the DGCL)." ***Thus, Alpha's obligation to indemnify was expressly limited by the extent to which Massey itself could have***

---

[176] *Massey Energy Co.*, 2011 WL 2176479 at *16 (internal quotations omitted).

*legally indemnified the Massey directors and officers had it remained independent—limitations that precluded Massey from indemnifying its fiduciaries for derivative settlements or judgments, bad faith misconduct, or other wrongdoing involving scienter.* Massey, for its part, as an Alpha subsidiary, would continue, too, to maintain its current obligations under its certificate of incorporation existing at the time of the Merger to indemnify Massey directors and officers. Massey's certificate of incorporation already guaranteed its directors and officers legally maximal advancement and indemnification rights. Massey's certificate also contained an exculpatory provision authorized by 8 *Del. C.* § 102(b)(7).

As a result, *the final Merger Agreement only had Alpha provide a guarantee that Alpha would accord the Massey directors and officers with the same protection they were afforded by Massey's certificate of incorporation*. This did not immunize Massey directors or officers from liability to Massey or Alpha for non-exculpated breached of fiduciary duty that harmed Massey. [177]

As the above passage makes clear, the Court did not adopt a construction of Section 5.05(b) of the Merger Agreement that contradicts the argument Blankenship has made here, *i.e.*, that he is entitled to advancement from Alpha for the Criminal Proceeding under Section 5.05(b) because he was made a party to that proceeding after the Effective Time for actions he took as a director and officer of Massey before the Effective Time. Accordingly, Alpha's judicial estoppel argument is without merit.

\* \* \* \* \*

For the reasons discussed above, under the plain meaning of the unambiguous terms of Section 5.05(b) of the Merger Agreement, Alpha is obligated to provide advancement to Blankenship for the expenses he has incurred in the Criminal Proceeding.

---

[177] *Massey Energy Co.*, 2011 WL 2176479, at \*16-17 (emphasis added); *see also id.* at \*26 ("Alpha only promised to indemnify the Massey Board and management to the extent Massey itself could have and did in fact do so.").

Section 5.05(b) conditions Alpha's obligation to do so "upon receipt of any undertaking in favor of Parent and the Surviving Corporation of a type contemplated by the Company Certificate of Incorporation [*i.e.*, Massey's Charter[178]]." Unsurprisingly, Alpha contests whether Blankenship has provided an appropriate undertaking. I turn to that issue next.

### E. Blankenship has provided a Valid Undertaking Entitling Him to Advancement from Alpha

In the Complaint, Blankenship sought an order "[d]eclaring that Defendants have each breached Mr. Blankenship's contractual rights under the Merger Agreement . . . to advancement of attorneys' fees and expenses regarding the [Criminal] Proceeding."[179] On February 27, 2015, after initiating this action, Blankenship delivered to Alpha the Alpha Undertaking, which states, in its entirety:

> I, Donald Blankenship, have retained counsel to represent me in connection with an investigation and indictment captioned *United States v. Blankenship*, No. 5:14-cr-00244, filed in the United States District Court for the Southern District of West Virginia, as well as in connection with any concurrent or other proceedings relating to (i) Performance Coal Company, Massey Energy Company (n/k/a Alpha Appalachia Holdings, Inc.) ("Massey"), Massey Coal Services, Inc.; (ii) any affiliates or parents, including Alpha Natural Resources, Inc. ("Alpha"); or (iii) employees or other persons associated with these entities. Pursuant to Section 5.05(b) of the Agreement and Plan of Merger dated as of January 28, 2011, among Mountain Merger Sub, Inc., Alpha Natural Resources, Inc., and Massey Energy Company, Alpha agreed to advance on my behalf the fees and costs associated with the representation to the fullest extent that Massey would have been permitted to do so under applicable law upon receipt of an

---

[178] The Merger Agreement defines "Company Certificate of Incorporation" as "[t]he Amended and Restated Certificate of Incorporation of [Massey] as in effect immediately prior to the Effective Time," which is same document defined above as the Charter. JX 26 (Merger Agreement) at § 1.05(a).

[179] Compl. Prayer for Relief ¶ C.

undertaking in favor of Alpha of a type contemplated by the Massey Certificate of Incorporation.

> As contemplated by Article Sixth of the Massey Amended and Restated Certificate of Incorporation dated June 1, 2011 . . . , I hereby make the following undertaking: if it shall ultimately be determined that I am not entitled to be indemnified under the Amended and Restated Certificate of Incorporation, consistent with [the] Delaware General Corporation Law, I agree to repay any sums that Alpha has expended on my behalf for indemnification or advancement.[180]

On its face, the Alpha Undertaking is different from the Undertaking. It does not include the Contingency Provision, any of the Undertaking's factual representations, or the Termination Provision.

Blankenship has requested that I order Alpha to advance his expenses for the Criminal Proceeding under the Alpha Undertaking.[181] In opposition, Alpha argues that Blankenship has "no contractual or other basis to unilaterally impose this new undertaking," contending that, under 8 *Del. C.* 145(e), it has "the right to impose terms and conditions on Mr. Blankenship's advancement" because he is a former officer and director of Massey.[182] Blankenship counters that because Massey's Charter does not expressly authorize Massey to impose any terms or conditions on such advancement, Section 5.05(b) of the Merger Agreement precludes Alpha from imposing any terms or

---

[180] JX 48 (Alpha Undertaking).

[181] Tr. of Oral Arg. 135-36; Pl.'s Reply Br. 18; Pl.'s Op. Br. 29-30.

[182] Defs.' Ans. Br. 30 n.25; Tr. of Oral Arg. 132-33.

conditions on his advancement "through the back door of an undertaking."[183]  I agree

with Blankenship that, under the plain language of the Merger Agreement and Massey's

Charter, Alpha does not have the right to impose any terms or conditions on

Blankenship's advancement other than an undertaking to repay.

As noted above, Section 5.05(b) of the Merger Agreement conditions Alpha's

obligation to provide advancement "upon receipt of any undertaking in favor of Parent

and the Surviving Corporation of a type contemplated by [Massey's Charter]."  Article

Fifteenth of Massey's Charter states, in relevant part:

> The right to indemnification conferred in this Article shall be a contract
> right and shall include the right to be paid by the Corporation the expenses
> incurred in defending any such proceeding in advance of its final
> disposition; provided, however, that, if the Delaware General Corporation
> Law requires, the payment of such expenses incurred by a director or
> officer in his or her capacity as a director or officer . . . in advance of the
> final disposition of a proceeding, shall be made only upon delivery to the
> Corporation of an undertaking, by or on behalf of such director or officer,
> to repay all amounts so advanced if it shall ultimately be determined that
> such director or officer is not entitled to be indemnified under this Article
> or otherwise.[184]

No other provision of the Charter mandates, or reserves the right for Massey to impose,

any additional terms and conditions in the undertaking that must be delivered to obtain

---

[183] Pl.'s Op. Br. 8.  Although Massey's Charter does not expressly condition advancement to a former director or officer upon delivery of an undertaking, Blankenship cannot legitimately dispute that, were he not entitled to indemnification, he would be required to repay the advanced legal expenses. *See Reddy v. Elec. Data Sys. Corp.*, 2002 WL 1358761, at *5 (Del. Ch. June 18, 2002).  Thus, I do not view Blankenship as arguing that he was not required under the Merger Agreement to deliver the Alpha Undertaking.

[184] JX 24 (Charter) at Art. Fifteenth.

advancement. Thus, as a matter of law based on the unambiguous words of Article Fifteenth,[185] the only form of undertaking "of a type contemplated by" the Charter is simply an undertaking to repay—*without* any additional terms or conditions.[186] Accordingly, because no provision of the Charter or the Merger Agreement expressly authorizes Alpha to demand any terms or conditions on advancement other than an undertaking to repay, Alpha does not have the right to request anything more from Blankenship than the Alpha Undertaking,[187] which he previously delivered.[188]

Then-Vice Chancellor Strine's analysis in *Reddy v. Electronic Data Systems Corp.*[189] further supports my conclusion here. In that case, a former employee (Reddy)

---

[185] Charters of Delaware corporations are interpreted through contract interpretation principles, and charter provisions that are reasonably susceptible to only one interpretation are afforded their "plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[186] *See In re Cent. Banking Sys., Inc.*, 1993 WL 183692, at *4 (Del. Ch. May 11, 1993) (concluding, where the only condition imposed by a mandatory advancement bylaw was the delivery of an undertaking to repay, that the corporation lacked the authority to require "that the recipient of advance indemnification furnish appropriate security or demonstrate financial responsibility as a condition to receiving advances").

[187] *See Havens v. Attar*, 1997 WL 55957, at *13 (Del. Ch. Jan. 30, 1997) ("When mandatory advancement is contractually provided, however, a board may not change the terms of 'mandatory' advancement by later conditioning that advancement upon a showing of financial responsibility.").

[188] Although the Alpha Undertaking was not executed in favor of both Massey and Alpha as contemplated by Section 5.05(b) of the Merger Agreement, any argument challenging the Alpha Undertaking on that ground has been waived. *See In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *18 (Del. Ch. Aug. 18, 2006).

[189] 2002 WL 1358761 (Del. Ch. June 18, 2002).

asserted that the corporation (EDS) was required to advance his legal expenses incurred in two pending lawsuits. EDS's advancement bylaw provided, in relevant part, that

> [e]ach person who at any time shall serve or shall have served as a Director, officer, employee or agent of the Corporation . . . shall be entitled to . . . the advancement of expenses incurred by such person from the Corporation as, and to the fullest extent, permitted by Section 145 of the DGCL[.][190]

Reddy argued he was entitled to advancement under the plain language of that bylaw without delivering an undertaking because an undertaking was not required by 8 *Del. C.* § 145 for advancement to a former employee. Then-Vice Chancellor Strine agreed, concluding that EDS was precluded under the unambiguous language of its bylaws from requiring an undertaking or imposing any other terms and conditions on Reddy's mandatory right to advancement:

> The General Assembly specifically amended that statutory subsection [*i.e.*, Section 145(e)] to give corporations the flexibility to advance funds to employees and agents without an undertaking. In lieu of this required undertaking, corporations may specify by bylaw or contract the terms and conditions upon which employees and agents may receive advancement, which could include an undertaking and more onerous pre-requisites to advancement. Having been accorded the freedom to craft its bylaws as it wished, EDS cannot point to its own drafting failures as a defense to Reddy's advancement claim, however. If it chose, EDS could have conditioned former employees' advancement rights on an undertaking, proof of an ability to repay, or even the posting of a secured bond. But it did not do so.[191]

The logic of *Reddy* applies with equal force here and supports my conclusion that, under the Merger Agreement and the Charter, the only term or condition that Alpha can impose

---

[190] *Id.* at *3.

[191] *Id.* at *4.

on advancement to Blankenship is an undertaking to repay if it shall ultimately be determined that he is not entitled to indemnification. Blankenship has provided such an undertaking in the Alpha Undertaking.

### F.    Blankenship's Expenses in the Criminal Proceeding are Reasonable

Massey's Charter limits indemnification, and concomitantly limits advancement, to expenses "reasonably incurred."[192] The Merger Agreement similarly limits Alpha's advancement obligations to "reasonable attorneys' fees and expenses."[193] The reasonableness of the invoices Blankenship has submitted for payment[194] was not the subject of any inquiry at trial, and Defendants devoted only two paragraphs of their post-trial brief to the subject. There, they argue that the summary or redacted invoices Blankenship has submitted are insufficient to establish that the legal fees he has incurred are reasonable. Defendants thus request that I either direct Blankenship to provide less redacted time sheets or appoint a special master to report on the reasonableness of the unredacted time sheets.[195] I decline Defendants' invitation to belabor this summary advancement proceeding for three reasons.

---

[192] *See* JX 24 (Charter) at Art. Fifteenth. This is consistent with the reasonableness standard for expenses under 8 *Del. C.* § 145. *See Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 823 (Del. 1992).

[193] JX 26 (Merger Agreement) at § 5.05(b).

[194] *See generally* JX 57.

[195] Defs.' Ans. Br. 63.

First, Massey previously agreed to the form of invoices and to the general parameters of Zuckerman Spaeder's hourly rates in the Engagement Letter, which provides that the invoices "will not contain an itemization of . . . time and expenses but will show a summary of hours and fees" to "avoid disclosure of privileged information and possible waiver of the attorney client privilege."[196] Defendants have not argued or otherwise shown that the unpaid invoices materially deviate from those agreed-upon terms and conditions, and they accepted and paid the invoices in this form for several years without complaint. I see no persuasive reason to depart from this course of dealing.

Second, in light of Alpha's cooperation agreement with the U.S. government, the practical realities of the Criminal Proceeding strongly weigh against requiring Zuckerman Spaeder to disclose itemized invoices about the legal services performed, which may shed light on the strategy for Blankenship's legal defense. I agree with Blankenship that there is a serious and unnecessary risk of prejudice to his defense in the Criminal Proceeding should, for example, Alpha be forced to (or voluntarily) turn any itemized invoices over to the government.

Third, employing a special master to review unredacted invoices would be an unnecessary endeavor and inconsistent with the efficient administration of justice in this case. "Advancement is not the proper stage for a detailed analytical review of the fees [for which advancement is sought], whether in terms of the strategy followed or the

---

[196] JX 21 (Engagement Letter) at DBDEL0010.

staffing and time committed."[197]  In *Fasciana v. Electronic Data Systems Corp.*,[198] then-Vice Chancellor Strine explained why persnickety disputes over the reasonableness of the attorneys' fees sought in advancement cases are frowned upon:

> [T]he function of a § 145(k) advancement case is not to inject this court as a monthly monitor of the precision and integrity of advancement requests. Unless some gross problem arises, a balance of fairness and efficiency concerns would seem to counsel deferring fights about details until a final indemnification proceeding, by which time the details may not even matter as [the person seeking advancement] may (depending on the outcome of the [underlying proceeding]) be obligated to repay all of the funds.[199]

Defendants have not advanced any substantive argument that the aggregate fees that have not been paid (approximately $5.8 million as of April 1, 2015) are unreasonable.  Nor have they identified, in my view, any "gross problem" or other legitimate reason that would warrant injecting a special master to "perform the task of playground monitor, refereeing needless and inefficient skirmishes in the sandbox."[200]  Disputes over the reasonableness of Blankenship's expenses in the Criminal Proceeding can ultimately be resolved when any determination on indemnification is made.

---

[197] *Duthie v. CorSolutions Medical, Inc.*, 2008 WL 4173850, at *2 (Del. Ch. Sept. 10, 2008).

[198] 829 A.2d 160 (Del. Ch. 2003).

[199] *Id.* at 177.

[200] *Reinhard & Kreinberg v. Dow Chem. Co.*, 2008 WL 868108, at *5 (Del. Ch. Mar. 28, 2008).

## G. Blankenship is Entitled to His Reasonable Expenses Incurred in Connection with this Action.

In Count IV of the Complaint, Blankenship seeks to recover the fees he incurred litigating this action. Massey's Charter provides that a claimant who seeks advancement and is "successful in whole or in part . . . shall be entitled to be paid also the expense of prosecuting such claim."[201] Under the Delaware Supreme Court's decision in *Stifel Financial Corp. v. Cochran* and its progeny,[202] a person who successfully prosecutes a claim under 8 *Del. C.* § 145 is typically entitled to recover the reasonable expenses incurred in connection therewith unless the corporation precludes such recovery upfront in the governing document or contract providing for indemnification.[203] Section 5.05(a) of the Merger Agreement provides that Massey's indemnification obligations survive the merger, and Section 5.05(b) provides that Alpha must indemnify Blankenship "to the fullest extent [Massey] would have been permitted to do so under applicable Law."[204]

In this opinion, I have concluded that Blankenship is entitled to advancement from Massey, under the Charter and Section 5.05(a) of the Merger Agreement, for all of the fees and expenses for which he seeks advancement; and from Alpha, under Section

---

[201] JX 24 (Charter) at Art. Fifteenth ¶ (a).

[202] 809 A.2d 555 (Del. 2002).

[203] *See id.* at 561; *see also Brady v. i2 Techs. Inc.*, 2005 WL 3691286, at *4 (Del. Ch. Dec. 14, 2005) (awarding "fees on fees" for a successful claim for advancement under Section 145); *Weaver v. ZeniMax Media, Inc.*, 2004 WL 243163, at *7 (Del. Ch. Jan. 30, 2004) ("Under *Stifel Financial*, if a corporation does not want to incur the obligation to pay 'fees on fees,' it must expressly preclude any such right.").

[204] JX 26 (Merger Agreement) at §§ 5.05(a)-(b).

5.05(b) of the Merger Agreement, for all of the fees and expenses incurred in the Criminal Proceeding. Although Blankenship did not prevail on his alternative claim in Count II based on the terms of the Engagement Letter, he has been "successful in whole" in my view in obtaining the relief sought in the Complaint. Accordingly, I find that Blankenship is entitled to all his reasonable expenses incurred in litigating this action from Massey and Alpha.[205]

## IV. CONCLUSION

For the foregoing reasons, judgment will be entered in Blankenship's favor on Counts I, III and IV of the Complaint and in Defendants' favor on Count II. Defendants must (1) advance Blankenship's unpaid legal expenses incurred in connection with the federal criminal investigation and the Criminal Proceeding and (2) pay his reasonable expenses of litigating this action. Counsel shall confer and submit an implementing order within five business days, providing for the foregoing payments to be made within ten business days of entry of judgment.

---

[205] *See, e.g.*, *Holley v. Nipro Diagnostics, Inc.*, 2014 WL 7336411, at \*15 (Del. Ch. Dec. 23, 2014) (awarding 100% of the plaintiff's legal expenses incurred in successfully prosecuting claims for advancement).